NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0634n.06

Nos. 10-6489, 10-6541

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 29, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| MARCUS S. CHANDLER and KENNETH N. | ) | |
| CIERS, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: COLE, ROGERS, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendants-appellants Marcus S. Chandler and Kenneth N. Ciers each entered conditional guilty pleas to conspiracy to distribute and possess with intent to distribute Oxycodone, in violation of 21 U.S.C. § 846, with Chandler also pleading guilty to possession of a firearm in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A). On appeal, both defendants challenge the denial of their motions to suppress. Upon review, we affirm.

I.

The undisputed facts of this matter were summarized by the district court as follows:

[This case] commenced [on January 26, 2010,] when Sergeant Bill Birkenhauer received a telephone call . . . from Brian Hamilton regarding drug activity being conducted by his roommate, Marcus Chandler. Although Hamilton initially expressed a desire to remain anonymous, he ultimately identified himself to Sergeant Birkenhauer. Hamilton advised that Chandler was selling large quantities of

Oxycontin and that he made frequent trips to Northern Ohio for that purpose. Sergeant Birkenhauer obtained Hamilton's name, address and telephone number and assigned the matter to Agent Brett Benton for further investigation.

Agent Benton met with Hamilton later on January 26, 2010. At that time and through later contacts with Hamilton, Benton learned additional details regarding the drug operation being conducted by Defendant Chandler. In relevant part, Hamilton advised agents of the NKDSF that Chandler made trips to Northern Ohio at least every other week, that Chandler would pay for Oxycontin and obtain a new shipment on each trip, that the supplier was from Detroit, Michigan, that Chandler would meet with his source of supply at Exit 122 or at the Wendy's restaurant just off Exit 125, that the supplier drove a dark colored sedan, and that Chandler never drove himself but would employ different drivers. Hamilton claimed to have the details of Chandler's operations because he had previously acted as his driver. Hamilton provided further details, including that Chandler would obtain a full tank of gas and supply the driver—usually an addict—with an 80 mg tablet of Oxycontin in exchange for driving him to Northern Ohio. According to Hamilton, the person with whom Chandler would meet to obtain additional drugs in exchange for payment was not the main supplier.

Hamilton also provided the agents with information regarding his living arrangement with Chandler. According to Hamilton, he began living with Chandler after Chandler's father was either arrested or investigated by the Lexington Drug Enforcement Agency for selling large quantities of Oxycontin. At that time, the DEA was also investigating Chandler. And according to Hamilton, Chandler maintained a safe for the storage of Oxycontin at his house that he shared with Hamilton. Further, after the initial call, agents were able to confirm many of relevant details. For example, they were able to confirm that Chandler's father had been investigated and arrested in Lexington for distributing Oxycontin.

On February 4, 2010, Hamilton notified Agent Benton that Chandler was planning to make another trip to Northern Ohio to purchase 100 to 200 Oxycontin tablets and was looking for a driver. Agents of the NKDSF then conducted surveillance of Chandler's residence and observed a black Ford F–150 truck arrive at that location. (Agents later identified [Daniel W.] Profitt as the driver of the Ford truck.) Agents followed the truck and observed two stops, including one at a gas station, before it returned to Chandler's residence. Although Hamilton was not at home at the time of this activity, he was in contact with Chandler (and NKDSF agents) by telephone.

Hamilton was advised by Chandler throughout the day that Chandler planned to make his usual trip to Northern Ohio to obtain Oxycontin and that the transaction would take place at the Wendy's restaurant parking lot near Exit 125. However, Chandler advised Hamilton that he was having difficulty finding a driver and that it might be necessary for Hamilton to drive. Later that afternoon, however, Chandler advised Hamilton that Profitt had agreed to drive him to Northern Ohio. (According to Hamilton, Profitt had previously purchased Oxycontin from Chandler.)

Based on the information received from Hamilton, Sergeant Birkenhauer contacted the Ohio Highway Patrol and spoke with Sergeant Schultz to advise him of the ongoing investigation and the events which were expected to transpire at the Wendy's restaurant in Northern Ohio. Sergeant Birkenhauer requested that the Ohio Highway Patrol assist with surveillance at the restaurant and Sergeant Schultz agreed to place an unmarked unit in the restaurant's parking lot.

Chandler and Profitt left the Chandler/Hamilton residence in Profitt's black Ford truck in the early evening on February 4, 2010, and were followed by members of the NKDSF as they proceeded to the Wendy's restaurant parking lot just off Exit 125 in Northern Ohio. The truck remained in constant surveillance during the trip and made no other stops during the three hour drive. Shortly after Chandler and Profitt arrived and entered the restaurant, a black Oldsmobile Alero sedan drove into the parking lot and parked next to the black truck belonging to Profitt. Profitt stayed inside, but Chandler exited the restaurant, walked to the black Oldsmobile, opened the passenger-side door and entered the vehicle. Less than five minutes later, Chandler exited the sedan and returned to the restaurant. During this time, no one other than Chandler exited the sedan. After Chandler returned to the restaurant, the sedan left the parking lot and was followed by an unmarked Ohio Highway Patrol vehicle.

Within fifteen minutes, Chandler and Profitt returned to Profitt's truck and headed south on Interstate 75 toward Kentucky. Birkenhauer testified that, based on his training and experience as well as surveillance and information that had been obtained throughout the investigation, he believed that a drug transaction had been completed in the restaurant parking lot. Further, he believed that the information initially supplied by Hamilton had been corroborated by the actions of Chandler and Profitt. As a result, Birkenhauer communicated this information to the Ohio Highway Patrol and requested assistance in stopping the black Oldsmobile.

\* \* \*

Although Chandler and Profitt were not stopped initially, they remained under surveillance by the NKDSF agents. Once Chander and Profitt were in Kentucky, agents requested that a marked cruiser (operated by Kenton County Officer Darrell Caldwell) assist with the traffic stop of Profitt's vehicle. At the time of this stop, NKDSF agents were aware that the black Oldsmobile had been stopped and that a large amount of currency had been recovered from that vehicle. The government concedes that no traffic violations were observed concerning Profitt's vehicle. Instead, the stop was made based solely on the request of NKDSF agents.

No display of force was made during the traffic stop of Profitt's vehicle. During the stop, Birkenhauer asked Profitt to explain the purpose of the trip and was told that he had driven Chandler to Ohio to "look at a truck." Profitt and Chandler were then asked to exit the vehicle and were patted-down for weapons but none were discovered. Shortly after the stop, a drug dog was brought to the scene. (Two agents involved in the surveillance had trained canines.) As an agent placed his arm on Chandler's arm to guide him to an officer's patrol car, the agent felt an unusual bulge on Chandler's arm, giving him reason to investigate further. This investigation resulted in the discovery of 140 Oxycontin tablets taped to Chandler's bicep area. Chandler and Profitt were then placed under arrest. Approximately 15 minutes elapsed from the stop until the arrest of the two Defendants in Kentucky.

Following their arrest, Chandler and Profitt were transported to the Lakeside Park/Crestview Hills police station and questioned by NKDSF agents. Both Chandler and Profitt made admissions regarding their conduct. Additionally, Chandler provided the agents with written consent to search his residence. Following this search, agents discovered additional prescription pills, drug paraphernalia, currency, and a stolen handgun.

* * *

After leaving the Wendy's restaurant parking lot, the Oldsmobile Alero was followed by Trooper Stacey Arnold of the Ohio Highway Patrol. Trooper Arnold has 16 years experience as a law enforcement officer with the past 12 years spent on enforcement of criminal laws and 10 years as a canine handler. Trooper Arnold was provided with details of the investigation by Sergeant Schultz as it was relayed to him by the Kentucky agents. Arnold testified that she followed the Oldsmobile for approximately 60 miles after it left the Wendy's lot. Around milepost 187, the vehicle crossed the right edge line of the highway "more than once" and fluctuated its speed from the speed limit to slightly over the speed limit. She then stopped the vehicle for the unmarked lanes violation under O.R.C. § 4511.33. The traffic stop

occurred at 9:17 p.m. In addition to Trooper Arnold, Sergeant Schultz participated in the stop. The vehicle was driven by Defendant Kenneth Ciers.

Trooper Arnold testified that, as she approached Ciers' vehicle, the driver was observed making "furtive movements" around the center console area. Upon request, Ciers produced his drivers license and registration. These documents confirmed that Ciers resided in the Detroit, Michigan area. Trooper Arnold advised Ciers that he had been stopped for crossing over the lane line, and fluctuating speed, and asked if he was too tired to drive or if he had been drinking. Ciers responded in the negative to both questions. In addition to his license and registration, Ciers produced a "stack of paperwork," explaining that he had previously had some issues with his driving privileges. However, he indicated that the paperwork would confirm that the issues had been resolved. According to Trooper Arnold, Ciers was "fumbling" with the paperwork and appeared to be "very nervous." In addition, his hands appeared to [be] shaking. When asked about the trip to Ohio, Ciers responded that he had argued with a family member in Michigan and was driving to "get some air." Arnold testified that she found this response "suspicious."

Trooper Arnold asked Ciers to exit the vehicle while Sergeant Schultz ran a check of the paperwork Ciers had provided. Although Ciers indicated that he did not have any weapons on his person, Trooper Arnold observed that Ciers "bladed" his body two times, which she described as an attempt to conceal something on his right side. Concerned about the possibility of a weapon, Arnold instructed Ciers to take his hands out of his pockets and then proceeded to conduct a pat-down. During the course of the pat-down, Arnold observed a large bundle of money in Ciers' right jacket pocket. Due to the belief that Ciers might also have a weapon in his pocket, the Defendant was handcuffed.

Although no weapon was found, Trooper Arnold read Ciers his Miranda rights, advised him he was under investigative detention, and placed him in the rear seat of Schultz's vehicle to permit her trained drug dog to search the vehicle. Although the dog alerted to the presence of drugs, no drugs were found. According to Trooper Arnold, the lack of drugs was not particularly unusual because the dog will alert even if drugs were present recently because an odor will remain in some instances. The Ohio officers then notified the NKDSF that they had recovered $9,900 in currency. Ciers was detained for approximately 24 minutes from the time Trooper Arnold activated her lights until Ciers was taken to the nearby police station. There, police confiscated the currency but did not immediately charge Ciers with any felony offenses. The total incident time was listed on Trooper Arnold's report as being one hour, twenty minutes.

*United States v. Chandler*, Criminal Action No. 2: 10–23–DCR, 2010 WL 2870723, at *2-5 (E.D.

Ky. July 20, 2010) (footnotes omitted).

Following their indictment on various federal drug crimes, both Chandler and Ciers filed

motions to suppress evidence stemming from the February 4, 2010, traffic stops. These motions

were referred to a magistrate judge who, after conducting a hearing and receiving testimony, denied

both motions. Soon thereafter, the district court adopted the magistrate's report and

recommendation, overruling defendants' objections. Chandler and Ciers then entered conditional

guilty pleas, reserving the right to appeal the denial of their suppression motions. Following

sentencing, both defendants filed timely appeals.

## II.

"The grant or denial of a motion to suppress is a mixed question of fact and law. On appeal,

we review the district court's findings of fact for clear error and its conclusions of law de novo."

*United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007) (citations omitted). A factual finding is

clearly erroneous when, although there may be evidence to support it, we are "left with the definite

and firm conviction that a mistake has been committed." *Id.* (internal quotation marks and citation

omitted). In reviewing the denial of a motion to suppress, we consider the evidence in the light most

favorable to the government. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006).

## III.

We begin our analysis with the claims of Chandler, who challenges the denial of his

suppression motion on two grounds: first, Chandler argues that the traffic stop of Profitt's vehicle

was not supported by reasonable suspicion, and second, he argues that the length of the traffic stop

exceeded the bounds of a constitutionally-permissible *Terry* stop. We disagree with both assertions.

The Fourth Amendment's protections against unreasonable searches and seizures "'extend

to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" *United States*

*v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 273

(2002)).[1]  Nonetheless, if a law enforcement officer has reasonable suspicion that criminal activity

is afoot, the officer may conduct a brief traffic stop for investigative purposes to confirm or dispel

his suspicions. *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968).  Reasonable suspicion

> requires more than a mere hunch, but is satisfied by a likelihood of criminal activity
> less than probable cause, and falls considerably short of satisfying a preponderance
> of the evidence standard.  If an officer possesses a particularized and objective basis
> for suspecting the particular person of criminal activity based on specific and
> articulable facts, he may conduct a *Terry* stop.

*Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (internal quotation marks and citation omitted).

"Reasonable suspicion for an investigative stop must be [assessed] under the totality of the

circumstances, considering all of the information available to law enforcement officials at the time"

of the stop. *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (internal quotation marks and

citation omitted).  Reasonable suspicion can be gleaned from the investigating officer's own direct

observations, dispatch information, and directions from other officers. *Dorsey*, 517 F.3d at 395.

Moreover, "[t]he totality of the circumstances analysis permits police officers to draw on their own

---

[1]It is undisputed that a seizure under the Fourth Amendment occurred in this case and that
Chandler, as a passenger in Profitt's vehicle, may contest the lawfulness of the stop. *See Brendlin*
*v. California*, 551 U.S. 249, 258 (2007).

experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Ellis*, 497 F.3d at 613 (internal quotation marks and citation omitted). Thus, "individual factors, taken as a whole, [may] give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (internal quotation marks and citation omitted).

In the present case, we agree with the district court that the initial stop of Profitt's vehicle fell well within the acceptable parameters of a lawful *Terry* stop based upon a reasonable suspicion of criminal activity. Indeed, the officers received detailed information from Hamilton, a known informant who had direct knowledge of Chandler's drug-related activities. Hamilton was able to predict when Chandler would leave his residence, the manner of travel, the location of the alleged narcotics transaction, and the general appearance of the supplier's vehicle. All of these predictions were thereafter confirmed by law-enforcement surveillance. In addition, the observed behavior of Chandler in quickly entering and exiting the black sedan, and the discovery of a large amount of currency in Ciers's pocket, provided further support for the brief stop of Profitt's vehicle.[2]

In contesting the existence of reasonable suspicion, Chandler asserts that Hamilton was not a reliable informant. Once again, we disagree. Tips from identified citizens, such as Hamilton, have a high degree of reliability, in part because such witnesses risk adverse consequences for providing

---

[2]Chandler emphasizes that the officers did not directly observe any criminal activity. "While true, this [argument] misses the point because if any criminal activity had been observed, our inquiry would be whether probable cause existed." *Perez*, 440 F.3d at 372 n.1.

faulty information. *United States v. Caruthers*, 458 F.3d 459, 465 (6th Cir. 2006). Moreover, Hamilton had direct knowledge of Chandler's drug-related activities because he was Chandler's roommate and had assisted Chandler in a previous drug transaction. *See Alabama v. White*, 496 U.S. 325, 328 (1990) (noting that an informant's "basis of knowledge" is "highly relevant" to assessing informant reliability). Finally, a large portion of the information provided by Hamilton accurately predicted Chandler's future behavior. *See United States. v. Cohen*, 481 F.3d 896, 899 (6th Cir. 2007) ("[A]n anonymous tip that accurately predicts a subject's future behavior in detail can be credited with a special familiarity with [the subject's] affairs and thus bears sufficient indicia of reliability to provide reasonable suspicion.") (internal quotation marks and citation omitted). Accordingly, the information provided by Hamilton was sufficiently reliable to support a finding of reasonable suspicion, supplying a basis upon which to perform a lawful *Terry* stop.

In his second claim of error, Chandler asserts that even if the stop of Profitt's vehicle was supported by reasonable suspicion, the duration of the stop was unreasonable and therefore exceeded the bounds of *Terry*. This argument is without merit.

A *Terry* stop must not only be justified at its inception, but also "must be reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Blair*, 524 F.3d 740, 750 (6th Cir. 2008). Accordingly, the detention must last no longer than is necessary to carry out the purpose of the stop. *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). "To assess whether a detention was too long to be justified as an investigative stop, [we] 'examine whether the police diligently pursued a means of investigation that was likely to confirm

or dispel their suspicions quickly.'" *Perez*, 440 F.3d at 372 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

In this case, there is no evidence in the record indicating that the officers were anything but diligent in conducting the investigative detention. Following their initial questioning, Chandler and Profitt were removed from their vehicle and searched for weapons. Thereafter, officers began to escort Chandler and Profitt to the marked patrol cars where they were to be temporarily detained for the duration of the on-site investigation. It was at this time that officers felt an unusual bulge on Chandler's biceps, which led to the discovery of the narcotics at issue. We find this sequence of events to demonstrate a reasonable and diligent investigation. *See Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999) (holding an investigative stop to be reasonable when it "included several steps, all of them reasonably necessary to ensure the officers' safety or to confirm or dispel their suspicions"). Moreover, while we do not adopt "rigid time limitation[s]" for permissible *Terry* stops, *Perez*, 440 F.3d at 372, it is relevant to note that the stop in this case lasted no longer than 15 minutes before the narcotics were discovered. *Cf. Sharpe*, 470 U.S. at 688 ("We reject the contention that a 20-minute stop is unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay about which he complains.").

Accordingly, for the reasons stated above, we affirm the district court's denial of Chandler's motion to suppress.

IV.

We now move to the claims of Ciers, who also challenges the denial of his suppression motion. To begin, we note that Ciers does not dispute the lawfulness of the initial stop of his vehicle. Indeed, Ciers concedes that law-enforcement officials possessed probable cause to believe that a traffic violation occurred and reasonable suspicion to believe that Ciers was recently involved in a narcotics transaction. *See Terry*, 392 U.S. at 30–31; *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004). Additionally, Ciers does not challenge the constitutionality of the pat-down search that led to the discovery of the currency. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005). Rather, Ciers asserts that when Trooper Arnold observed the currency in his open jacket pocket, she was not constitutionally permitted to seize it. This claim, however, fails for two reasons: first, Ciers forfeited any claim regarding the seizure of the currency by neglecting to raise the issue before the district court, *see Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 242 n.5 (6th Cir. 2011), and second, Ciers's claim fails on its merits because the seizure falls within the plain-view exception to the warrant requirement.

"Under the plain view doctrine, 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'" *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007) (quoting *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). In this case, Ciers admits that Trooper Arnold was in a lawful position from which to view the currency and had "a lawful right of access." However, Ciers asserts that the incriminating nature of the currency was

not "immediately apparent," thereby preventing the application of the plain-view doctrine. We disagree.

In determining whether the incriminating nature of evidence is "immediately apparent," we assess three factors, "none of which is necessary but each of which is instructive[.]" *Garcia*, 496 F.3d at 510. These factors are:

> (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*Id.* (internal quotation marks, citation, and emphasis omitted).

In the case at bar, there was a strong nexus between the purpose of the investigatory stop and the currency. Indeed, law-enforcement officials had reasonable suspicion to believe that Ciers had recently participated in an illegal narcotics transaction. Moreover, while the mere possession of currency is innocent behavior, the *large amount* of currency possessed by Ciers was unusual.[3] Finally, no additional investigation was needed to establish the likely connection between the currency and the suspected narcotics transaction.[4] Therefore, the incriminating nature of the currency was "immediately apparent." *See United States. v. Green,* 599 F.3d 360, 376 (4th Cir.

---

[3]The diameter of the bundle of currency was four to four-and-a-half inches thick, thereby indicating a likelihood of a large amount of money.

[4]Ciers contends that the incriminating nature of the currency was not immediately apparent to Trooper Arnold. However, this assertion is not supported by the record. More importantly, Trooper Arnold's subjective beliefs play no role in our probable-cause analysis. *Whren v. United States*, 517 U.S. 806, 813 (1996).

2010) (holding the incriminating nature of a large sum of money to be "immediately apparent" when defendant was suspected of drug-related activities); *United States v. Bustos-Torres*, 396 F.3d 935, 945 (8th Cir. 2005) (holding a large sum of currency to likely be "evidence of the drug trade"); *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003) (upholding seizure of $10,000 cash under plain-view doctrine when "the deputy had reason to believe that the money was proceeds of the drug trafficking"); *United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996) (holding that "bundles of cash strewn about the inside of the vehicle" were properly seized under the plain-view doctrine) (overruled on other grounds by *Muscarello v. United States*, 524 U.S. 125 (1998)).[5]

Therefore, we affirm the district court's denial of Ciers's motion to suppress.

V.

We affirm.

---

[5]Because we find that the seizure of the currency falls within the plain-view exception to the warrant requirement, we need not address whether the seizure would also be permissible under the "plain-feel" doctrine. *See Garcia*, 496 F.3d at 505 ("[A]n officer may seize an object whose contour or mass makes its identity as contraband immediately apparent.") (internal quotation marks and citation omitted).