**UNITED STATES of America,**

v.

**Armando JAIMEZ, Defendant.**

**Civil Action No. 1:11–CR–0264–AT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Signed May 21, 2013.

Libby Skye Davis, U.S. Attorney's Office, Atlanta, GA, for United States of America.

Armando Jaimez, Montgomery, AL, pro se.

Thomas C. Rowsey, Law Office of Thomas C. Rowsey, P.C., Roswell, GA, Herbert Shafer, Office of Herbert Shafer, Jeffrey Lyn Ertel, Federal Defender Program Inc., Atlanta, GA, for Defendant.

## ORDER

AMY TOTENBERG, District Judge.

This matter is before the Court on the Magistrate Judge's Order and Report and

Recommendation ("R & R") [Doc. 274] and Defendant Armando Jaimez's ("Jaimez") objections thereto [Doc. 288]. The Magistrate Judge recommended that the Court grant Defendant Jaimez's Motion to Suppress [Doc. 268; 1:11–cr263, Doc. 60] and his amendments thereto [Docs. 269, 270; 1:11–cr–263, Docs. 62, 69]. For the reasons expressed below, the Court **ADOPTS IN PART** the Magistrate Judge's Report and Recommendation, **DECLINING TO ADOPT** her recommendation regarding the suppression of the documentary evidence seized from Jaimez's home. This Order supplements and sets forth in greater detail the Order announced by the Court at the April 15, 2013 hearing in this case. (*See* Doc. 419.)

## I. LEGAL STANDARD

Under Rule 59(a) of the Federal Rules of Criminal Procedure, a magistrate judge may rule on any matter referred by a district judge that does not dispose of a charge or defense. If any party files objections to a magistrate judge's order on nondispositive matters, "the district judge must consider timely objections and modify or set aside any part of the order that is contrary to law or clearly erroneous." Fed.R.Crim.P. 59(a). Rule 59(b) provides that a magistrate judge may make recommendations and proposed findings of fact on dispositive matters referred by a district judge. A party who wishes to object to such recommendations by a magistrate judge must "file specific written objections," and the "[f]ailure to object in accordance with [Rule 59(b)(2)] waives a party's right to review." Fed.R.Crim.P. 59(b)(2). Under Rule 59(b)(3), the "district judge must consider de novo any objection to the magistrate judge's recommendation."

If no objections are filed to a magistrate judge's recommendation, the district judge reviews the report and recommendation for clear error and may "accept, reject, or modify" the magistrate's findings and recommendations. 28 U.S.C. § 636(b)(1). Where the parties do not file objections, 28 U.S.C. § 636 does not require the district court to review any issue in dispute de novo; however, the statute "does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a de novo or any other standard." *Thomas v. Arn*, 474 U.S. 140, 154, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

Defendant Jaimez timely filed objections (Doc. 288) to the Magistrate's Report and Recommendation regarding his Motion to Supress. Accordingly, the Court conducted a de novo review of the facts and legal arguments regarding Jaimez's suppression motion.

## II. OVERVIEW

On June 7, 2011, several Cherokee County law enforcement officers drove to Defendant Jaimez's home to serve him with a federal arrest warrant and search his residence and vehicles. The officers did not have a search warrant. However, they asked Jaimez for permission to search his home for drugs and weapons and he agreed to that limited request. During the search, the officers found and seized several cellular telephones, over forty thousand dollars in packaged cash, and several spiral-bound notebooks.[1] Jaimez moved to suppress this evidence arguing

---

1. The officers also confiscated packaging materials found in the bedroom associated with the packaged cash. (Nov. 15, 2011 Suppression Hrg., Ex. 15 *Kemp Drive Miranda and Interview, ("Ex. 15")* at 10:10–11:57; Nov. 15, 2011 Jaimez Suppression Hrg. Tr., Doc. 80 ("J. Tr.") at 36, 57.) The Court considers the packaging material as part of the evidence of packaged cash, and as explained below, denies Jaimez's motion to suppress this evidence.

that his consent was not voluntary and even if it were, the officer exceeded the consent by searching for money, phones, and private papers. The Magistrate Judge recommended the denial of Jaimez's Motion to Suppress. She rejected Jaimez's argument that his consent was involuntary but agreed that the consent was limited to a search for drugs or weapons. She also found that the police had, in fact, searched only places where drugs or weapons might be found, and thus did not exceed the scope of Jaimez's consent. The Magistrate Judge then applied the plain view doctrine and reasoned that any evidence confiscated during the search was properly seized so long as the incriminating nature of the evidence was immediately apparent. Finally, the Magistrate Judge determined that the incriminating nature of the cellular phones, packaged cash, and spiral notebooks was immediately apparent, and on that basis, recommended that the Court deny Jaimez's motion to suppress.

As more thoroughly explained below, the Magistrate Judge erred when she determined that the incriminating nature of the spiral notebooks was immediately apparent. Instead, the Court finds that the spiral notebooks had normal covers that contained no handwriting and did not appear obviously incriminating. Only upon opening the notebooks and perusing their contents did the officer determine they were incriminating. Accordingly, the Court **GRANTS** Jaimez's motion to suppress this evidence.

## III. FINDINGS OF FACT

The Court conducted a de novo review of the record that was before the Magis-

trate Judge on Jaimez's suppression motion. In addition, on April 15, 2013, the Court heard additional testimony from Deputy Ashley Pope, the Deputy Sheriff of Cherokee County Sheriff's Office ("CCSO") who conducted the interview of Jaimez at his home and reviewed the spiral notebooks. The government also tendered additional exhibits at this April 15 hearing. Based on this evidence, the Court provides the following factual findings.[2]

On June 7, 2011, Defendant Jaimez pulled into his driveway at 6174 Kemp Drive in Ackworth, Georgia, followed immediately by Deputy Pope and Cherokee County law enforcement officer Agent Reynolds. (Nov. 15, 2011 Jaimez Supression Hrg. Tr., Doc. 80, ("J. Tr.") at 3–6, 6–7, 13.) Deputy Pope and Agent Reynolds exited their vehicle as Jaimez exited his. (J. Tr. at 13–14.) Deputy Pope then asked Jaimez if he minded if the officers stepped inside the residence to talk. (J. Tr. at 14.) Jaimez agreed. (J. Tr. at 14.) Unbeknownst to Jaimez, Deputy Pope carried a warrant for Jaimez's arrest.

Before questioning Jaimez, Deputy Pope asked if the officers could search his home for drugs or weapons, and Jaimez said they could. (Apr. 15 Hrg. Tr., Doc. 419, ("Apr. 15 Hrg. Tr.") at 39; see also Ex. 16 at 3.)[3] Deputy Pope then explained to Jaimez that several other officers would enter the home and begin the search. (Ex. 16 at 4.)

Over the course of the next three to four hours, at least nine police officers went through Jaimez's home searching for drugs or weapons. (See J. Tr. 18–20, 46–47.) Each officer was dressed in civilian clothes and each carried a concealed weap-

---

2. The Court adopts the Magistrate Judge's factual findings regarding the search and seizure in Jaimez's home to the extent such findings do not contradict the findings herein.

3. Unless otherwise indicated, the exhibits referenced in this Order are the Government's exhibits introduced at the November 11, 2011 hearing.

on. (*See* J. Tr. 18–20, 46–47; Ex. 16 at 3–4.) During the search of Jaimez's home, Jaimez's wife continued to cook in the kitchen and his teenage children continued watching television. (J. Tr. at 23–26, 33, 40, 52, 70, 72–73, 77.) None of the officers touched Jaimez or any of his family members, except when they handcuffed Jaimez at the end of his interview. (J. Tr. at 23–24.) Likewise, none of the officers threatened Jaimez or forced him to make any promises. (J. Tr. at 72.) The atmosphere in Jaimez's home was generally relaxed, Jaimez was cooperative, and the officers' conduct was not coercive or threatening. (*See* Ex. 15.)[4]

The law enforcement officers then searched places in the home where drugs or weapons might be found. (Apr. 15 Hrg. Tr. at 40.) During the course of the search, the officers seized several cellular phones and a large amount of packaged currency. (J. Tr. at 36, 56.)

The law enforcement officers also seized six spiral notebooks found in Jaimez's master bedroom closet. (J. Tr. at 36; Apr. 15 Hrg. Tr. at 42, Exs. 55–60.)[5] Each notebook bore the normal, non-descript plastic cover of most spiral notebooks and no writing was visible on the exterior of the notebook. (Apr. 15 Hrg. Exs. 55–60.) With Jaimez present, Deputy Pope then opened the notebooks and inspected their pages. (*See* Ex. 15 at 11:57–12:30, 13:25–21:50.) He noticed certain numbers corresponding to what he believed to be the cost of a kilogram of cocaine in Cherokee Coun-

ty and several names of individuals associated with these values. (J. Tr. at 36, 53–56; Ex. 15 at 14:50–60; 19:00–36; J. Tr. at 56.) Based on the written contents of some of the pages, and Deputy Pope's three years of experience investigating drug cases, Deputy Pope surmised that the notebooks evidenced drug activity. (J. Tr. at 56–57; Apr. 15 Hrg. Tr. at 37–38.) Deputy Pope had become familiar with "owe-me" lists, handwritten notes and lists that drug dealers keep. (J. Tr. at 55.) According to Pope, owe-me lists typically memorialize drug transactions by the name of the buyer or seller, the amount of drugs, and the value of the sale. (*See* J. Tr. at 55–56.) And after physically opening and perusing each notebook, Deputy Pope determined that these notebooks contained such owe-me lists. (*See* Apr. 15 Hrg. Tr. at 37–38, 41.)[6] Deputy Pope then relied, in part, on these owe-me lists to question Jaimez. (Ex. 15 at 14:50–16:30; J. Tr. at 56.)

## IV. DISCUSSION

As an initial matter, the Court, having conducted a de novo review of the facts and legal principles at play here, adopts the Magistrate Judge's findings and conclusions of law regarding the voluntariness and limited scope of Jaimez's consent to search his home. Accordingly, the Court finds that Jaimez's consent was voluntary and the product of an "essentially free and unconstrained choice." *U.S. v. Purcell*, 236 F.3d 1274, 1281 (11th Cir.2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S.

---

**4.** Exhibit 15 is the audio recording of Deputy Pope's interview of Jaimez on June 7, 2011.

**5.** Jaimez did not object to the admission into evidence of the images of the spiral notebooks' covers, marked as Exhibits 55, 56, 57, 58, 59 and 60. (April 15 Hrg. Tr. at 42.)

**6.** Although it was theoretically possible for Deputy Pope to find remnants of drugs within

the pages of these notebooks, it is clear from the audio recording of Deputy Pope's June 7, 2011 interview of Jaimez that he was not in fact searching for drugs themselves within the pages, but rather, inspecting the notebooks for written evidence of drug *transactions*. (*See* Ex. 15 at 11:57–22:00.) In fact, no drugs were discovered in the house during the search.

218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).[7] As the Magistrate Judge found, Jaimez consented, however, only to a search of his home for drugs or weapons.[8] Thus, the law enforcement officers were limited to searching only places where drugs or weapons might be found.[9] Here, however, the law enforcement officers seized items other than drugs or weapons. Thus the question is whether the seizure of these items is consistent with the strictures of the Fourth Amendment's protection from unlawful seizure. The relevant principle is the plain view doctrine.

■■■ "An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent." *U.S. v. Hromada*, 49 F.3d 685, 690 n. 11 (11th Cir.1995) (citing *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)); *accord Harris v. U.S.*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968) ("[O]bjects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence."). All of the items seized were located in a place where the officers were lawfully present. In addition, the Court agrees with the Magis-

trate Judge that the incriminating nature of the cellular phones was immediately apparent. Indeed, Deputy Pope testified that he knew the investigation resulting in Jaimez's indictment included wiretaps, (J. Tr. at 55–56), and here, he came across not one, but several cellular phones, (Ex. 15 at 13:35–14:00), suggesting in this context that the phones were used for drug sales. *See, e.g., U.S. v. Rodriguez–Alejandro*, No. 1:08–cr–0363–TWT–RGV, slip op. at 46–47 (N.D.Ga. Sept. 11, 2009) (Vineyard, Mag. J.) (finding that the incriminating nature of four cell phones, lying out in the open, was immediately apparent in the context of a drug trafficking wiretap investigation), approved and adopted, 664 F.Supp.2d 1320, 1346 (N.D.Ga.2009) (Thrash, J.).

Likewise, the Magistrate Judge correctly determined that the incriminating nature of the packaged cash was immediately apparent. Deputy Pope testified that, based on his experience investigating similar drug crimes, the large amount of packaged currency indicated that the money was intended for cross-border shipment, likely for the purposes of the drug trade. (J. Tr. at 57–58.) And courts routinely hold that in contexts such as this one, this large amount of packaged cash is inherently incriminating. *See, e.g., U.S. v. Chandler*, 437 Fed.Appx. 420, 428 (6th Cir.2011) (collecting cases and holding that "the in-

---

7. The Court notes, however, that according to Deputy Pope, the search of Jaimez's home went on for upwards of four hours. (J. Tr. at 47.) During this time, at least nine armed police officers went through his home searching for drugs or weapons. *(See* J. Tr. 18–20, 46–47.) Although the officers appeared friendly and professional, did not brandish their weapons, and made no threats, the Court has no doubt that such an encounter was personally intimidating. Nonetheless, the Magistrate Judge applied the appropriate legal standards and found that the officers' actions did not overcome Jaimez's will such that his consent was invalid. Upon the

Court's de novo review of the record, the Court agrees.

8. During the April 15, 2013 hearing, Deputy Pope reiterated that the scope of Jaimez's consent was limited to only places where drugs or weapons might be found. (*See, e.g.,* Apr. 15 Hrg. Tr. at 40.)

9. The Court also agrees with the Magistrate Judge that, although Jaimez signed a written consent form, "nothing in the written consent form can be objectively or reasonably read to expand Defendant's specific consent to search for drugs or weapons." (Doc. 274 at 120.)

**1344**

criminating nature of the currency was immediately apparent" (internal quotation marks omitted)). Thus, the Court adopts the Magistrate Judge's findings of fact and conclusions of law regarding Jaimez's motion to suppress the cellular phones and currency.

■ The Magistrate Judge erred, however, when she concluded that the incriminating nature of the spiral notebooks was immediately apparent. The Magistrate Judge implicitly found that the written contents of these notebooks were in plain view. *(See* Doc. 123–4 ("During the consent search, the deputy stated that he observed such 'owe-me' lists that particularly caught his attention because the amounts on the lists coincided with the price of a kilogram of cocaine.").) The facts as illuminated at the April 15, 2013 hearing before the Court, however, show otherwise.

■ "The 'immediately apparent' requirement is a vital constraint on the plain view doctrine exception to the Fourth Amendment warrant requirement." *U.S. v. Garcia,* 496 F.3d 495, 510 (6th Cir.2007). "This constraint prevents law enforcement officers from engaging in a general "exploratory search," obviating the Fourth Amendment requirement of a particularized warrant." *Id.* (citing *Horton,* 496 U.S. at 136–37, 110 S.Ct. 2301; *Arizona v. Hicks,* 480 U.S. 321, 334, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (O'Connor, J. dissenting) ("The purpose of the immediately apparent requirement is to prevent general, exploratory rummaging in a person's belongings.")). Accordingly, courts should avoid diminishing the strength of this requirement at the risk of "jeopardize[ing] fundamental Fourth Amendment principles." *Id.*

■ "The incriminating nature of an item is 'immediately apparent' if the offi-

cers have 'probable cause' to believe that the item is either evidence of a crime or contraband." *U.S. v. Buchanan,* 70 F.3d 818, 826 (5th Cir.1995) (citing *Hicks,* 480 U.S. at 326–27, 107 S.Ct. 1149). "If, however, the police lack probable cause to believe that an object in plain view is [evidence of a crime or] contraband without conducting some further search of the object—i.e., if its incriminating character [is not] immediately apparent—the plain-view doctrine cannot justify its seizure." *U.S. v. Lall,* 607 F.3d 1277, 1291 (11th Cir.2010) (quoting *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)); *accord Hicks,* 480 U.S. at 325–26, 107 S.Ct. 1149; *U.S. v. Silva,* 714 F.Supp. 693, 696 (S.D.N.Y.1989).

The cases of *Hicks* and *Silva* are particularly on point. In *Hicks,* law enforcement officers searched the defendant's apartment after learning that a bullet was fired through the defendant's floor, injuring his downstairs neighbor. *Hicks,* 480 U.S. at 323, 107 S.Ct. 1149. As the search was justified only by the exigent circumstances surrounding the gunshot, its scope was limited to a search for the shooter, victims, or weapons. *Id.* at 324–25, 107 S.Ct. 1149. However, upon entering the apartment, the officers noticed expensive stereo equipment, out of place in the otherwise ramshackle apartment. *Id.* at 325, 107 S.Ct. 1149. Suspecting that the property might have been stolen, the officers moved the stereo equipment to expose the serial number. The Supreme Court held that by doing so, officers "produced a new invasion," that must itself be justified by probable cause. *Hicks,* 480 U.S. at 325–26, 107 S.Ct. 1149. "[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of [the defendant's] privacy unjustified by the exigent circumstances that validated the entry."

*Id.* at 325, 107 S.Ct. 1149. The incriminating nature of the stereo equipment was not immediately apparent. Finding that no probable cause existed to conduct this new search of the equipment, the Court affirmed the decision to suppress the evidence. *Id.*

A federal court in New York applied the *Hicks* principle to a case quite similar to the one here. *U.S. v. Silva,* 714 F.Supp. 693, 696 (S.D.N.Y.1989). In *Silva,* a court found that the incriminating nature of the contents of a notebook was not apparent until law enforcement officers opened the notebooks and inspected their contents. *Silva,* 714 F.Supp. at 696 (citing *Hicks,* 480 U.S. at 325–26, 107 S.Ct. 1149). "Any act on the part of an agent beyond merely viewing what is already exposed would clearly constitute a search." *Id.* at 696. As probable cause to open the notebook did not exist, the seizure of the notebook was improper. *Silva,* 714 F.Supp. at 696. The instant case is no different.

Jaimez has moved to suppress the collection of spiral-bound notebooks seized from his home during a search for drugs or weapons. However, the incriminating nature of the notebooks was not apparent until Deputy Pope opened and searched their contents—a search that lacked probable cause. Each of these notebooks bore normal, nondescript covers, (*see* Apr. 15 Hrg. Exs. 55–60), and the government put forth no testimony upon which the Court can conclude that the contents of any of the notebooks were visible. Thus, like the notebooks in *Silva,* the notebooks here "had no markings on the cover[s] and

nothing to suggest [their] contents." *Silva,* 714 F.Supp. at 696. At first glance, the notebooks appear to be the type of books used for school, business or personal writing. One might likely conclude that the notebooks belonged to Jaimez's school-aged children. Thus, the incriminating nature of these notebooks was not immediately apparent for purposes of the plain view doctrine. Accordingly, by opening and perusing the notebooks, Deputy Pope engaged in an additional search requiring probable cause. *Id.; Hicks,* 480 U.S. at 326, 107 S.Ct. 1149; *see also Garcia,* 496 F.3d at 510–511.

In a case such as this one, "an officer may not inspect a book or document beyond reading what is plainly visible unless he or she has probable cause to proceed with the search, independent of the justification for the initial intrusion." *Silva,* 714 F.Supp. at 696 (citing *Hicks,* 480 U.S. at 325, 107 S.Ct. 1149). The evidence before the Court shows that Deputy Pope only had probable cause to believe the notebooks were owe-me lists when he began flipping through their pages. Deputy Pope's conduct and testimony shows that he in fact did not assess the incriminating nature of the notebooks until he opened them.[10]

The Court finds that the incriminating nature of the notebooks was not immediately apparent and Deputy Pope lacked probable cause to search their contents. Accordingly, the Court grants Jaimez's motion to suppress this documentary evi-

---

**10.** Moreover, the Government has not made clear why the officers failed to seek and obtain a warrant to search Jaimez's home for private papers. Indeed, the Court sees no reason why the officers could not have applied for a search warrant at some point during the four-hour interrogation of Jaimez, particularly considering that modern technol-

ogy and state law allow for the expeditious processing of warrant applications. *See Missouri v. McNeely,* —— U.S. ——, 133 S.Ct. 1552, 1561–62, 185 L.Ed.2d 696 (2013) (recognizing that states, like Georgia, allow for remote warrant authorizations) (citing, *inter alia,* O.C.G.A. § 17–5–21.1).

dence.[11]

## V. CONCLUSION

For the foregoing reasons, the Court **ADOPTS IN PART** the Magistrate Judge's Order and Report and Recommendation ("R & R") [Doc. 274], overruling Defendant Armando Jaimez's objections [Doc. 288] to the extent he seeks to suppress any evidence other than the spiral notebooks found in his home. The Court **DECLINES TO ADOPT** the Magistrate Judge recommendation regarding the admissibility of these notebooks and, accordingly, **GRANTS** Jaimez's suppression motion [Docs. 268, 269, 270] to this extent.

**IT IS SO ORDERED.**

---

**11.** The grant of Jaimez's motion to suppress extends not only to the notebooks themselves, but also to the tangible and testimonial evidence that is "the product of the [notebooks], or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Murray v. U.S.*, 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (quoting *Nardone v. U.S.*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939)). Evidence shall not be suppressed, however, to the extent such evidence has an independent source. *Id.* (citing *Nix v. Williams*, 467 U.S. 431, 443, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)); *U.S. v. Stilling*, 346 Fed.Appx. 458, 459 (11th Cir.2009).