NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0567n.06

No. 09-6095

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Aug 12, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff–Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| WILLIAM MCCALL , | ) | EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant–Appellant. | ) | |
| | ) | |

Before: MOORE and GIBBONS, Circuit Judges; BORMAN, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Defendant–appellant William McCall appeals

his conviction and sentence for conspiracy and possession with intent to distribute

methamphetamine. McCall argues that the district court erred (1) by denying his motion to suppress

the evidence seized during a warrantless search of the automobile he was driving, and (2) by

applying a two-level firearm enhancement to his Sentencing Guidelines offense level during

sentencing. For the reasons that follow, we affirm the district court.

I.

On the morning of May 15, 2008, Mark Hollis, a drug interdiction officer for the Johnson

City Police Department pulled over a red 1993 Pontiac, which was following the vehicle in front of

it too closely. The car was driven by McCall, who testified that he was returning to Wytheville,

_____

[*]The Honorable Paul D. Borman, United States District Judge for the Eastern District of
Michigan, sitting by designation.

Virginia, after having traveled to North Carolina. McCall had borrowed the car from Susan Teaster, a family friend; Teaster had acquired the Pontiac from Honeycutt Towing, which had taken possession of the car following a traffic stop and the failure of the original owner to reclaim it.

Hollis took McCall's license and then noticed two rifles in the back seat of the Pontiac. When he inquired about them, McCall told Hollis that he had recently purchased the rifles from a friend and that Hollis should feel free to "run them." Hollis went back to his police cruiser and began to enter McCall's license information. Hollis also called for assistance from his fellow officer, Patrick Muncey, as was his custom when weapons were present during a traffic stop.

Before Muncey could arrive, Hollis approached McCall again to ask for his social security number. Hollis then returned to his cruiser and finished the paperwork. Just as he was printing off the ticket, Muncey arrived. Hollis told Muncey that he had observed two rifles in the Pontiac and did not want to approach McCall alone again, so the two of them approached McCall together. Hollis gave McCall back his paperwork and driver's license and issued a warning citation while Muncey stood across from him on the opposite side of the car.

Although Hollis later testified that McCall was free to go, he never said that to McCall. Instead, Hollis asked if he could run the guns, and McCall said he had no objection. Hollis then asked McCall to step out of the Pontiac and to permit him to do a brief pat-down search, to which McCall acquiesced. Once he was out of the car and had been searched, McCall started to hand the guns to Hollis, but Hollis told McCall to step back with Muncey. While McCall and Muncey waited in front of Hollis's cruiser, Hollis seized the guns, radioed in information about them, then took them back to his cruiser to "get them out of the way."

2

At some point during this exchange, prior to placing the guns in his cruiser, Hollis claims to have asked for and received consent from McCall to search the Pontiac. First, Hollis asked if there were any illegal narcotics or large sums of cash in the car, and McCall replied, "no." Then, Hollis asked if he could search the vehicle, to which McCall replied that there was nothing illegal in the car. Hollis repeated his request to search the vehicle, stating, "Do you have a problem with me searching the vehicle?" Hollis testified at the suppression hearing that McCall said "No, sir," while McCall testified at trial that he said, "I guess you can."

Hollis had a microphone on his person that could have clarified what was said, but according to Hollis that microphone "didn't pick up the consent to search the car." Muncey, however, did have a functioning microphone, and he testified at the suppression hearing—after listening to his tape—that McCall said "No, sir." In his Report and Recommendation following the suppression hearing, the magistrate judge noted that Hollis's microphone had problems but found there was nothing suspicious about this.

While searching McCall's vehicle, Hollis inspected the center console and noticed that the plastic covering of the console was loose. Hollis put his finger underneath the loose plastic covering, lifted it up, looked inside, and observed a black object wrapped in electrical tape. Inside the object were two bags filled with a substance later determined to be methamphetamine. After a field test indicated the presence of illegal drugs, Hollis placed McCall under arrest, read him the *Miranda* warning, searched his pockets, and called another unit to come and transport him.

Adam Lunceford arrived to transport McCall to the station. Lunceford searched McCall and found a small bag of methamphetamine in his side pocket. Tests revealed—and the parties

stipulated—that the three bags found in McCall's possession contained 206.6 grams of substance which was 36.6% pure methamphetamine, yielding 81.8 grams of methamphetamine.

McCall was transported to the police station where he was questioned. The officers testified that McCall offered to purchase 20 grams of methamphetamine from someone in North Carolina if they would drop the charges. McCall disputed their testimony.

After questioning, McCall was put into a holding cell with other prisoners, one of whom was Ronnie Frost. At trial, Frost testified that he and McCall had conversations about McCall's activities. Frost testified that McCall told him about his illegal drug activities, the guns in his car, and his trial strategy. Of relevance to this case, Frost testified that McCall told him he planned to trade the guns for methamphetamine. McCall insisted at trial that these conversations never took place.

Prior to trial McCall moved to suppress the evidence obtained during the search of his vehicle and in his subsequent interview with the police. The magistrate judge held an evidentiary hearing on October 3, 2008. The magistrate judge found that McCall voluntarily gave consent to search his vehicle and that the console cover was loose, giving Hollis reason to lift the console with his finger. Lifting the loose cover, the magistrate found, did not constitute a "dismantling" of the car, as McCall had argued.

After McCall objected to the magistrate's Report and Recommendation, the district court found that (1) the stop was extended because McCall both suggested and consented to Hollis's running information on the guns; (2) McCall's consent, which the district court found was undisputed, was knowing and voluntary; and (3) Hollis's search did not exceed the scope of

4

McCall's consent. The district court therefore adopted the report, overruled McCall's objections, and denied McCall's motion to suppress.

At trial, McCall's theory of the case was that the drugs had been left in the car by the previous owner. McCall testified on his own behalf. The government countered with Frost's testimony as well as testimony from DEA agents that the methamphetamine was "very moist" and "hadn't had time to dry out," when it would be impossible for methamphetamine to still be moist after fourteen months in a car. DEA agents also testified that drug traffickers use guns for protection and sometimes trade guns for other guns, cars, and drugs. The jury found McCall guilty.

At sentencing, in relevant part, the probation officer recommended that McCall's offense level be increased two levels because a dangerous weapon was possessed. McCall objected, arguing that the evidence presented at trial in no way demonstrated that the two firearms were connected to the offense. At the sentencing hearing, McCall's attorney emphasized that the guns were hunting guns, that there was no ammunition, and that Frost's testimony was incredible, rendering it "clearly improbable . . . that those guns in any way related to the drug offense." The government responded that the burden is on McCall to show that the guns were not related to drug trafficking, which he had not shown, and that it had reached its burden through Frost's testimony that McCall planned to trade the guns for drugs.

Despite finding Frost not very credible, the district court agreed with the government, applied the enhancement for possession of a dangerous weapon, and sentenced McCall to 210 months' imprisonment.

No. 09-6095
*United States v. William McCall*

II.

When reviewing the denial of a motion to suppress, this court reviews the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Simpson*, 520 F.3d 531, 534 (6th Cir. 2008). Under the clearly erroneous standard, a reviewing court "will not reverse a lower court's finding of fact simply because it would have decided the case differently. Rather . . . [the] reviewing court must ask whether on the entire evidence it is left with the definite and firm conviction that a mistake has been committed." *United States v. Orlando*, 363 F.3d 596, 603 (6th Cir. 2004) (internal quotations and citations omitted). In this instance the evidence is therefore reviewed in the light most favorable to the district court's decision and the government's position. *See United States v. Shamaeizadeh*, 80 F.3d 1131, 1135 (6th Cir. 1996); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*).

A.

McCall's first argument challenging the district court's decision not to suppress the evidence is that the district court erroneously failed to make a finding on whether he gave consent. McCall quotes his objections to the magistrate's Report and Recommendation, in which he stated: "In his motion to suppress and supplemental motion to suppress, defendant disputed the claim that he provided consent to the search of the automobile he was driving on May 15, 2008. . . . Respectfully, the defendant asserts that the record does not support such a finding, and he objects." But the district court found that "it appears the defendant does not dispute that he consented to the search of his vehicle."

McCall's present characterization of his objection is simply incorrect, and this argument is meritless. McCall's objections do not clearly dispute consent. Rather, the objections begin by stating, "The basic facts in this case are not in dispute." Then, in reciting the facts, the objections continue: "Sometimes between 11:40 and 11:42:37 a.m., Officer Hollis asked for and received permission [from] the defendant to search [his] car," and "Hollis then approached the defendant . . . and asked if he could now search the car. Again, under the circumstances, the defendant consented." Considering that his objections repeatedly state that McCall consented, it was not clearly erroneous for the district court to believe that McCall did not dispute consent, especially because the argument in the objections was that any consent given was not voluntary.

The very paragraph in which McCall allegedly disputes consent provides clarification of the exact nature of McCall's argument. Although McCall begins the paragraph by stating he "disputed the claim that he provided consent to the search of the automobile," he then further elaborates on his argument, stating:

> Because the search was conducted without a warrant and without probable cause, it is the government's burden to establish that defendant's consent was knowingly and voluntarily given. In his Report and Recommendation, the Magistrate Judge found that the consent to search was knowing and voluntary. Respectfully, the defendant asserts that the record does not support such a finding, and he objects.

This focus on voluntariness confirms the district court's view. Moreover, even in this paragraph McCall speaks of "the consent to search," suggesting that such consent existed.

Rule 59 of the Federal Rules of Criminal Procedure requires that a party "serve and file *specific* written objections." Fed. R. Crim. P. 59(b)(2) (emphasis added). McCall's objections cannot be read as objecting to the fact that he consented but only as objecting to the knowing and

voluntary nature of his consent. Given the content of McCall's objections, the district court did not err in stating that consent was not disputed.

B.

McCall's second argument is that the traffic stop was extended beyond the necessary amount of time without reasonable suspicion of criminal activity. He argues that any consent offered therefore came in violation of his Fourth Amendment rights and that any evidence acquired from the stop must be suppressed. *United States v. Urrieta*, 520 F.3d 569, 579 (6th Cir. 2008). We conclude, however, that the delay in departure came at McCall's suggestion and followed his consent to "run" the guns. Furthermore, McCall remained free to leave throughout the incident.

We have previously clarified that a police officer "does not violate the Fourth Amendment merely by approaching an individual . . . and asking him whether he is willing to answer some questions. This includes a request for consent to search the individual's vehicle." *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (*en banc*) (internal citations omitted). Whenever a reasonable person "would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). Without any basis for suspicion, officers may "ask questions of [an] individual; ask to examine the individual's identification; and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their request is required." *Id.* at 434–35 (citations omitted). Therefore, as long as a reasonable person would feel free to leave, Hollis's request to "run" the guns, and his request while

running the guns to search the vehicle represent the type of questioning an officer is permitted to undertake, even without reasonable suspicion.

The Supreme Court has clarified that a person is "seized," and therefore is not free to leave, when there are circumstances such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality opinion). Our court has further elaborated factors for determining whether a person would feel free to leave: "(1) [T]he purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as . . . whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police. . . ." *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003) (quoting *United States v. Crossley*, 224 F.3d 847, 861 (6th Cir. 2000). We conclude that the totality of the evidence indicates McCall was not illegally seized and that a reasonable person in McCall's position would feel free to leave under the circumstances. At the time Hollis asked to run the guns, the officers never displayed a weapon or touched McCall. There is no allegation that the requests were made in a harsh tone of voice. Although two officers were on the scene, this precaution was standard procedure when guns are present, and no evidence suggests that Hollis or Muncey acted in a threatening or unprofessional way. McCall was unrestrained when Hollis asked to run the guns. The location of the question—as McCall sat in his vehicle—was not hostile or coercive. The length of time it took

to ask to run the guns was negligible. Most importantly, McCall initiated the idea of running the guns.

We have previously found that a reasonable person would not feel free to leave when asked by police to remain. *See United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010); *United States v. Smith*, 594 F.3d 530, 539 (6th Cir. 2010); *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). Here, although the officers did not tell McCall that he was free to leave, the officers also did not ask McCall to remain. Rather, Hollis gave McCall the ticket and simply asked if he could run the guns, as McCall had previously suggested. We have also previously held that a person is not free to leave when the police block the car, preventing departure. *See United States v. Gross*, No. 08-4051, slip op. at 7 (6th Cir. June 15, 2011); *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009). Here, however, the officers were standing on the side rather than blocking McCall's car, and they had returned all of the documents McCall needed to be on his way. McCall had all of his necessary documentation and was in no way impeded. The officers did not coerce, threaten force, or show hostility. Under our precedent, McCall was, therefore, free to leave when Hollis asked to run the guns.

After McCall gave permission to run the guns, and then after he gave permission to search the vehicle, nothing occurred to suggest that the consensual encounter evolved into a seizure which would trigger additional Fourth Amendment protections. Hollis's taking possession of the guns, for instance, did not transform the nature of the interaction because McCall himself suggested it and had begun to hand the weapons to Hollis. Moving the guns to the police cruiser did not constitute a seizure because McCall gave permission to search the vehicle, and the guns were only moved in the

10

context of conducting the consensual search. Guns are uniquely dangerous, particularly in the context of a traffic stop. *See Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977) (noting "a significant percentage of murders of police officers occur when the officers are making traffic stops" and permitting officers to order stopped drivers out of a car as a protective measure (quoting *United States v. Robinson*, 414 U.S. 218, 234, n.5)). Given this context, Hollis reasonably believed that the scope of McCall's consent included taking the guns back to the police vehicle while the guns were being run and the automobile search was being conducted. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); *United States v. Garrido–Santana*, 360 F.3d 565, 575–76 (6th Cir. 2004) (holding search of a gas tank fell within scope of suspect's consent when he knew officers were searching for drugs). The delay of departure was the result of McCall's suggestion of and consent to Hollis's running the guns. During the incident, McCall was unrestrained and uncoerced and could have withdrawn his consent at any time, asked for his rifles back, and been on his way.

The district court found that the continuation of the traffic stop stemmed from McCall's suggesting to Hollis that he could run the guns and then permitting Hollis to do so. It was not clear error for the district court to make this factual finding.

Because McCall was free to leave, he was not detained. The traffic stop was not unlawfully prolonged, and no Fourth Amendment violation prohibits admission of the evidence Hollis later obtained.

11

C.

McCall's third argument is that Hollis's search of the vehicle, particularly his lifting of the center console, was a "dismantling" of the vehicle that exceeded the scope of the consent McCall had given.

The scope of a warrantless search is limited by the scope of consent. *United States v. Gant*, 112 F.3d 239, 242 (6th Cir. 1997). The standard is objective reasonableness; the primary question is "what would the typical reasonable person have understood by the exchange between the officer and the suspect"; and the scope of the search is defined by the expressed object of the search. *United States v. Garrido-Santana*, 360 F.3d 565, 576 (6th Cir. 2004) (quoting *Jimeno*, 500 U.S. at 251–52 (1991)).

McCall argues that Hollis dismantled part of his car, an action that exceeded the scope of the consent McCall had given. The district court, however, found that "there is no evidence that Officer Hollis dismantled anything," and "there is nothing in the record to find that the defendant somehow limited the scope of the search." Moreover, the express object of the search was illegal drugs, so Hollis was given permission by McCall to search the vehicle for drugs, and the district court found that, when searching for such contraband, "it would not be unreasonable for him to look in the console [and] upon noticing that the gear box was loose, lift it up."

We review the district court's factual finding that Hollis did not dismantle the car for clear error. *Simpson*, 520 F.3d at 534. McCall offers no argument for why the district court was clearly wrong to find that the scope of consent was to search for illegal drugs, that the console cover was loose, and that no dismantling took place.

12

We also find that this case is analogous to the search of a closed bag that the Supreme Court permitted in *Jimeno*. 500 U.S. at 252. In *Jimeno*, the defendant gave permission for police to search his car for illegal drugs, and the United States Supreme Court found that opening a closed paper bag found in the car did not exceed the scope of that permission. *Id.* Here, McCall gave permission to search his car for illegal drugs. We find that a reasonable person would understand that the search for illegal drugs would include looking in the center console of a vehicle and lifting the console cover upon discovering that it was loose. We therefore affirm the district court.

III.

McCall argues that it was error for the district court to apply a two-level firearms enhancement during sentencing, pursuant to Sentencing Guideline § 2D1.1(b)(1). When reviewing application of the Sentencing Guidelines, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Anderson,* 526 F.3d 319, 323 (6th Cir. 2008).

In order to apply the enhancement, if the government can show that the defendant actually or constructively possessed a weapon during the offense, it will enjoy a presumption that the weapon was connected to the offense. *United States v. Wheaton*, 517 F.3d 350, 367 (6th Cir. 2008). McCall undisputedly possessed the weapons at the time he was running illegal drugs, so the government enjoys the presumption. In order to overcome the presumption and the district court's factual finding, McCall must show it was "clearly improbable" that the weapon was connected with the offense. *Id.*; *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002).

McCall argues that the guns were unloaded and were more likely to be used for hunting than for drugs. He analogizes this fact situation to a reference in the Sentencing Guidelines explaining

that the presence of "an unloaded hunting rifle in the closet" of a person arrested at home would not justify applying the enhancement. U. S. Sentencing Guidelines Manual § 2D1.1(b)(1) (n.3) (2009). This case, however, is not similar to a person who is arrested while at home. McCall was arrested on the road, with guns in the back seat of his car, while smuggling illegal drugs. While it is possible that McCall's possession of the weapons was innocent, it is not so clearly improbable as to overcome the presumption. The guns were found in McCall's car along with a substantial amount of methamphetamine; DEA agents testified that guns are often traded for drugs, cars, or other guns; and Frost testified that McCall, in fact, intended to trade the guns for drugs. The district court did not err in determining that the connection between the guns and the offense was not "clearly improbable." Accordingly, we affirm the district court's application of a two-level firearms enhancement.

IV.

For the foregoing reasons, we affirm the district court.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.**

I concur in Parts I and II of the majority's opinion, affirming the district court's denial of McCall's motion to suppress. I respectfully dissent, however, from Part III and would conclude that the district court erred in applying the two-level firearm sentencing enhancement. The firearms were unloaded hunting rifles, and there was no ammunition in the car. I believe that this situation is analogous to the example provided in the Sentencing Guidelines, which states that "the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." United States Sentencing Guidelines § 2D1.1 cmt. n.3. The district court, moreover, found "it[] difficult . . . to give [Ronnie Frost] a great amount of credence" and did not rely on Frost's testimony to apply the enhancement. R.88 (Sent. H'rg Tr. at 13, 15). Instead, the district court relied on its own "experience [that] firearms are traded for drugs and vice versa all the time." *Id.* at 15. If the district court's general experience regarding the trade of firearms and drugs is all that is necessary to apply the enhancement, then the presumption that arises when a defendant possessed the firearm during the offense is, in effect, irrebuttable. Indeed, the district court appears to have treated McCall's possession of the firearms in that way; after stating that, in its experience, firearms and drugs are traded "all the time," the district court concluded: "So the United States Sentencing Guidelines Section [2D1.1(b)(1)] states, if the defendant possesses a firearm, increase two levels. So this is an appropriate increase." *Id.*

For these reasons, I respectfully dissent.