NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0049n.06

No. 19-2389

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **FILED**<br>Jan 26, 2021<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DEVIN DEVON-MOORE LEWIS | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     CLAY, GIBBONS, and NALBANDIAN, Circuit Judges

JULIA SMITH GIBBONS, Circuit Judge.  Devin Devon-Moore Lewis was walking down an alley in Kalamazoo, Michigan with an acquaintance when he was stopped by law enforcement officer Nick Oliver.  At first, Oliver focused most of his attention on Lewis's acquaintance, whom Oliver knew from prior interactions.  During the course of the encounter, however, Oliver became suspicious that Lewis was involved in criminal activity.  Oliver requested backup and gradually shifted his attention to Lewis.  Once a second officer arrived on the scene, Oliver and the other officer physically restrained and searched Lewis.  They found that Lewis was carrying a firearm, drugs, and drug paraphernalia.

Lewis was indicted and charged with possession of a firearm as a felon, possession of methamphetamine with intent to distribute, and possession of a firearm in furtherance of drug trafficking.  He filed a motion to suppress, arguing that Oliver violated his Fourth Amendment right against unreasonable search and seizure.  After an evidentiary hearing, the district court

denied the motion. Lewis pled guilty and was sentenced to 135 months of imprisonment. On appeal, he challenges the district court's denial of his motion to suppress. Because Oliver had reasonable suspicion to conduct a *Terry* stop and search Lewis for weapons by the time that Lewis was seized, we affirm.

I.

Around 10:50 p.m. on October 9, 2018, Kalamazoo law enforcement officer Nick Oliver was patrolling a high-crime area in a marked police vehicle. Oliver spotted two people walking in a public alley that Oliver knew was commonly used to evade police detection and trespass on neighboring properties. He decided to investigate and drove into the alley, approaching the individuals. Oliver parked his patrol car several feet away from the two individuals and got out. According to Oliver, his vehicle was parked parallel to the alleyway, and there was enough room on either side for a person to walk past. Oliver did not activate the light bar on top of his vehicle, but he did direct his headlights and shone a flashlight towards the individuals. He was in full police uniform and was carrying his service pistol, but he did not draw his weapon.

As he got out of his vehicle, Oliver recognized one of the individuals in the alley as Amber French. Oliver, from prior experiences with French, knew that she had used drugs in the past and had stolen items from houses and trashcans. The other individual was the defendant, Lewis. Oliver's interaction with Lewis and French was captured by his body camera, and, thus, the following sequence of events is largely undisputed. Oliver greeted French and Lewis and asked if he could talk to them for a minute. He approached French, who was standing several feet in front of Lewis. Shortly after, Oliver asked Lewis to take his hand out of his pocket, explaining that he did not know whether Lewis was armed. As Lewis removed his hand from his pocket, he patted his waistband, which Oliver took as an indication that Lewis might be carrying a weapon.

After asking Lewis to keep his hands visible, Oliver turned his attention back to French and began talking to her about an altercation he had had with her boyfriend the week before. He offered to run a warrant check on French and told her that he would let her go as long as she did not have any outstanding felony warrants. French agreed. While Oliver was talking to French, he noticed Lewis brush something small and white from behind his left ear and onto the ground. Oliver testified that based on his experience as a police officer, he believed that Lewis was discarding some sort of contraband. Oliver noticed that Lewis was standing at an angle with his right hip away from Oliver, a position Oliver described as "bladed." He testified that this was "a common stance for people to use who are carrying guns." DE 59, Hr'g Tr., Page ID 255:23–24. Oliver also observed that Lewis had an "abnormally large bulge" around his right hip, which Oliver believed could be a gun. *Id.* at Page ID 256:3–4. Based on these observations, when Oliver used his radio to ask a dispatcher whether French had any outstanding warrants, he also requested backup because he believed that Lewis was armed.

Oliver then asked French who her friend was and gestured towards Lewis. French said Lewis was her friend, and then Oliver asked Lewis directly what his name was. Lewis responded that his name was "Duke," and Oliver followed up, asking him "Duke what?" trying to get Lewis to give him a full name. Oliver testified that he thought Lewis was being evasive by giving him a nickname instead of his full name. Oliver asked if Lewis was the same person whom he had given a ride to earlier, but French told him that he had given a ride to her other friend.

After talking to French for a few more minutes, Oliver turned to Lewis again and asked "what's your name bud? What's your real name?" CA6 R. 27, Body Cam Video, at 20:46:09. Instead of answering, Lewis asked Oliver why this matter concerned him since Oliver was primarily talking to French. Oliver explained that he liked to know the people in his patrol area

and said that he had let French and others go before when they only had petty warrants outstanding. He again asked Lewis for his real name. At this point Oliver also moved closer to Lewis, so he was standing in between French and Lewis instead of just in front of French. After some back and forth, Lewis told Oliver that his name was Devin Moore. Oliver asked Lewis if he had any outstanding warrants, and Lewis said that he did not. Oliver told Lewis that he would search the name Devin Moore to confirm that there were no outstanding warrants but that he was not concerned with "minor" warrants like traffic violations or failure to pay child support.

About thirty seconds after Oliver asked the radio dispatcher to check whether Devin Moore had outstanding warrants, headlights appeared down the other side of the alley approaching the area where Oliver, Lewis, and French were standing. As the headlights approached, Oliver moved closer to Lewis and asked whether he was carrying any weapons or tools, telling him that he noticed Lewis had something bulky in his waistband. Lewis replied that he was not armed, but Oliver still told Lewis not to reach towards his waistband. Oliver then asked Lewis if he could search him, but Lewis refused. Around the same time, it became clear that the approaching headlights were from a second marked police vehicle. The second vehicle parked, blocking what had been an unobstructed path down the other end of the alley. Officer Greg Day, the backup that Oliver had requested, exited the vehicle in full uniform and stood next to his patrol car, several feet from where Lewis and Oliver were.

At this point, Oliver's attention was focused on Lewis. Oliver asked Lewis again whether he was armed, and Lewis put his hands up. Oliver asked Lewis to take his backpack off, and Lewis complied. Oliver asked Lewis if he was afraid of something and told him to relax. Oliver then grabbed Lewis's right wrist as Officer Day grabbed his left wrist. Lewis tried to break free of the officers' holds and, according to Oliver, attempted to punch him. The officers pinned Lewis to a

fence and waited for more officers to arrive before handcuffing and searching him. The officers found a loaded handgun in Lewis's waistband at his right hip and drugs and drug paraphernalia in his backpack. Officers also found a partially smoked marijuana joint on the ground where Lewis was standing when he brushed something from behind his left ear.

On November 7, 2018, Lewis was indicted on charges of possession of a firearm as a felon, possession of methamphetamine with intent to distribute, and possession of a firearm in furtherance of drug trafficking.[1] On December 12, 2018, Lewis filed a motion to suppress the evidence seized by Oliver, arguing that he was unlawfully detained and searched in violation of his Fourth Amendment rights. After an evidentiary hearing, the district court denied Lewis's motion. The district court determined that Lewis was seized when "Officer Day arrived, at least partially blocking the other end of the alley, Officer Oliver moved several steps closer to Lewis and used a more commanding tone." DE 35, Order Den. Mot. to Suppress, Page ID 88. The district court reasoned, however, that by then Oliver had established reasonable suspicion that Lewis had been or was engaged in criminal activity. Specifically, the district court found that Oliver had reasonable suspicion because Lewis was in a high-crime area in an alley where people regularly trespassed, was with a known drug user and petty thief, and had exhibited behaviors characteristic of someone discarding contraband and of someone carrying a weapon. The district court also found that Oliver had reasonable suspicion to suspect that Lewis was armed and dangerous, which justified frisking Lewis during the stop.

After the district court denied the motion to suppress, Lewis pled guilty to counts one and four of the superseding indictment, but he reserved the right to appeal the district court's denial of the motion to suppress. Lewis was sentenced to a total of 135 months of imprisonment.

---

[1] On January 8, 2019, the grand jury returned a superseding indictment, which added additional charges related to another incident that occurred before Lewis's encounter with Oliver.

On November 27, 2019, he filed a timely appeal, arguing that Oliver's detention and search of his person violated his Fourth Amendment rights.

## II.

When reviewing a denial of a motion to suppress, the district court's factual determinations are reviewed for clear error and its legal conclusions are reviewed *de novo*. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016) (citing *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007)). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court, utilizing the entire evidence, 'is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir. 2007) (quoting *United States v. Navarro–Camacho,* 186 F.3d 701, 705 (6th Cir.1999)). "Whether a seizure is reasonable is a question of law, which we review de novo." *United States v. Winters*, 782 F.3d 289, 295 (6th Cir. 2015). Whether reasonable suspicion existed is a mixed question of law and fact, which we also review de novo. *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002). At all times, the evidence must be viewed "in the light most likely to support the district court's decision." *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006) (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994)).

## III.

### A.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. CONST. amend. IV. Interactions between the public and police officers fall into three categories: "consensual encounters in which contact is initiated by a police officer . . . ; a temporary involuntary detention or *Terry* stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable

cause." *United States v. Campbell*, 486 F.3d 949, 953–54 (6th Cir. 2007) (quoting *United States v. Bueno*, 21 F.3d 120, 123 (6th Cir. 1994)). For purposes of the Fourth Amendment, an encounter between an officer and a citizen becomes a seizure when the officer restrains the person's freedom of movement "by means of physical force or a show of authority." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). Put another way, a person is seized when a reasonable person would not believe he or she was free to leave or disregard the officer's requests. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004). In addition, the person must actually surrender to the officer's show of authority. *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010). The question of when a seizure occurs is relevant because "[o]nce a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a *Terry* stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." *Campbell*, 486 F.3d at 954.

Whether a person is seized is based on the totality of the circumstances from the perspective of a reasonable person in the defendant's position. *Mendenhall*, 446 U.S. at 554. Examples of circumstances that indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*; *see also United States v. McCall*, 433 F. App'x 432, 437 (6th Cir. 2011) ("Our court has further elaborated factors for determining whether a person would feel free to leave: '(1) [T]he purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as . . . whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police.'" (quoting *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir.

2003))). Simple police questioning is insufficient to constitute a seizure. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see also United States v. Drayton*, 536 U.S. 194, 201 (2002) ("[L]aw enforcement officers . . . may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means."). In certain circumstances, however, "words alone may be enough to make a reasonable person feel that he would not be free to leave." *Richardson*, 385 F.3d at 629−30 (finding an individual was seized after an officer asked him to "just hang out right here for me, okay?"); *see also United States v. Smith*, 594 F.3d 530, 534, 539 (6th Cir. 2010) (seizure occurred when officers asked the defendant to stop and told him that he would be free to leave as soon as they determined he was not involved in unlawful activity).

Here, Lewis contends that he was seized the moment Oliver parked his car in the alley, began talking to French and Lewis, and pointed his flashlight at them. The district court, however, found that seizure did not occur until the second officer arrived on the scene and Oliver moved closer to Lewis and used a more commanding tone. On appeal, the government asks this court to affirm the district court's finding of when seizure occurred.

Lewis's argument that he was seized the moment Oliver approached him and French in the alley lacks merit. The district court found that Oliver spoke "in a very causal and non-threatening tone, directing the vast majority of his questions and conversation toward French rather than Lewis." DE 35, Order Den. Mot. to Suppress, Page ID 88. Lewis's exit was not blocked; he could have walked away down the other end of the alley or walked around Oliver's patrol vehicle. Oliver also did not draw his weapon. *See Campbell*, 486 F.3d at 956 (defendant was not seized when officer "had neither drawn his weapon nor activated his emergency lights or siren"). The few direct statements Oliver made to Lewis—asking him to take his hand out of his pocket and asking

for his name—did not amount to a seizure. *See Drayton*, 536 U.S. at 201 (asking for identification in a noncoercive manner is not a seizure). Lewis argues that Oliver asserted his authority when he asked Lewis to take his hands out of his pockets, but, considering the totality of the circumstances, Oliver's request did not amount to a seizure. *See United States v. Preston*, 579 F. App'x 495, 499 (6th Cir. 2014) (no seizure occurred when an officer "asked in a conversational tone to see [the defendant's] hands . . . without drawing his gun, and without accusing [defendant] of wrongdoing, or physically touching him"). Thus, because Lewis had multiple available exit paths, Oliver spoke in a casual tone, and the majority of the focus was on French rather than Lewis, the district court correctly held that Lewis was not seized when Oliver first approached French and Lewis.[2]

The interaction changed, however, about five minutes into the encounter when Oliver shifted his attention to Lewis. Oliver moved so that he was standing in between Lewis and French, asked Lewis again what his real name was, and followed up with him until Lewis told him his full name. Oliver then told Lewis that he would check to see if the name he provided, Devin Moore, was associated with any outstanding warrants. Unlike his previous conversation with French, Oliver did not ask Lewis whether he would like him to see if he had any outstanding warrants. Instead, Oliver told Lewis directly that "[he]'ll run that [warrant check] real quick." CA6 R. 27, Body Cam Video, at 20:47:24. Oliver also said that he was not concerned if Lewis had warrants for minor offenses, stating that "it's not about warrant arrests tonight." CA6 R. 27, Body Cam Video, at 20:47:34. Saying he was not concerned with petty warrants, however, implies that Oliver would arrest Lewis if Oliver learned of any felony warrants. Even though Oliver's tone remained casual and he did not draw his weapon, a reasonable person in Lewis's position would not feel free to leave after Oliver said he was checking to see if Lewis had outstanding warrants in these

---

[2] For these same reasons, I respectfully disagree with the dissent's argument that Lewis was seized when Oliver initially stopped Lewis and French after he drove his vehicle into the alley.

circumstances. *See Campbell*, 486 F.3d at 956 (the defendant was seized when the officer told the defendant that he "could be on his way just as soon as [the officer] I'd him."); *see also Smith*, 594 F.3d at 539; *Richardson*, 385 F.3d at 629. Accordingly, Lewis was seized at this moment.[3]

B.

Having identified the point when the seizure occurred, our next inquiry is whether Oliver had reasonable suspicion to detain Lewis at that moment.[4] In *Terry v. Ohio*, the Supreme Court held that when a law enforcement officer has a reasonable, articulable suspicion that a person may be involved in criminal activity, he may, consistent with the Fourth Amendment, conduct a brief investigatory stop of the person. 392 U.S. 1, 30–31 (1968). Reasonable suspicion consists of more than a mere hunch, but "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Whether reasonable suspicion exists "must be based on specific, objective facts" and "the totality of the circumstances in place at the time of seizure." *United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010) (first quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)). In addition, the officer may rely on his "own experience and specialized training to make inferences from and deductions about the cumulative information available." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Here, Oliver had reasonable suspicion to justify a *Terry* stop because by the time that Lewis was seized he had multiple indicators that Lewis may have been involved in criminal activity.

---

[3] While the concurrence asserts that Lewis was not seized until the second officer arrived, I continue to maintain that, given the totality of the circumstances, a reasonable person in Lewis's position would have felt unable to leave when Oliver focused his attention on Lewis and told him he was going to check whether he had outstanding warrants.

[4] The choice between whether Lewis was seized when Oliver told him he was searching to see if he had outstanding warrants or when the second officer arrived does not affect the reasonable suspicion analysis. At both times, Oliver had already observed all the factors that supported a finding of reasonable suspicion.

The first indicator was that Lewis was in a high-crime area walking in an alley that people regularly used to avoid police detection and to trespass on neighboring properties. While this fact on its own could not create reasonable suspicion, it is a relevant factor in the analysis. *See Wardlow*, 528 U.S. at 124 (holding that whether the defendant was in a high crime area was a relevant factor when determining reasonable suspicion).

Second, Oliver saw Lewis brush a small object from behind his left ear and onto the ground. Based on his experience as a law enforcement officer, Oliver knew that this was a common method people used "to discard drug evidence upon the sight of police." DE 59, Hr'g Tr., Page ID 257:19–20; *see United States v. Pearce*, 531 F.3d 374, 382 (6th Cir. 2008) (finding that actions that could be interpreted as an effort to conceal contraband contribute to reasonable suspicion); *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006) (finding reasonable suspicion "based upon [defendant's] hand movements consistent with drug-dealing activity, efforts to evade the police upon noticing them, and presence in a high crime area").

Third, Lewis was evasive when Oliver asked for his name. *See Johnson*, 620 F.3d at 694 ("The Supreme Court has held that 'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.'" (quoting *Wardlow*, 528 U.S. at 124)); *see also Smith*, 594 F.3d at 541 (finding that the defendant's evasive and vague answers to the officer's questions supported a finding of reasonable suspicion).

Fourth, there were several factors that indicated to Oliver that Lewis may have been armed. When Oliver first approached French and Lewis, he noticed that Lewis patted his right hip. Oliver testified that he was "trained in the police academy" that people often subconsciously pat the area where they are carrying a gun. DE 59, Hr'g Tr., Page ID 253:8–11. Oliver also noticed a bulge in Lewis's waistband at his right hip, the same area he had patted earlier. *See Mimms*, 434 U.S. at

111–12 ("[T]he bulge in the jacket permitted the officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer."); *United States v. Stennis*, 457 F. App'x 494, 499–500 (6th Cir. 2012) (finding that a bulge suspected to be a weapon was a relevant factor as to reasonable suspicion). Finally, Oliver observed that Lewis was standing in a "bladed position" with his right hip angled away from him; Oliver testified that he recognized this as a "common stance for people to use who are carrying guns." DE 59, Hr'g Tr., Page ID 255:20–24.[5] *United States v. Chandler*, 437 F. App'x 420, 424, 426 (6th Cir. 2011) (approving of officer's pat-down search of the defendant after the officer observed the defendant assumed a bladed position).

Based on the totality of the circumstances, Oliver had a reasonable suspicion that Lewis was engaged in criminal activity at the time of the seizure. *Arvizu,* 534 U.S. at 274−75 (holding that the court must consider whether all the facts, taken together, warranted further investigation.). Lewis was in a high-crime area and his behavior during the encounter with Oliver was evasive and consistent with a person carrying a weapon and concealing drug evidence.[6] Thus, Oliver had reasonable suspicion to conduct a *Terry* stop by the time that Lewis was seized and did not infringe on Lewis's Fourth Amendment rights.

---

[5]     Lewis appears to dispute the district court's finding that there was a bulge in his waistband and that he was standing in a defensive position. Based on Oliver's body cam video, however, the district court's factual findings that there was a bulge at Lewis's right hip or that he was standing in a bladed position were not clearly erroneous. Accordingly, this court accepts the district court's factual findings as true. *United States v. Pacheco*, 841 F.3d 384, 389 (6th Cir. 2016).

[6]     The parties dispute whether Lewis's association with French—who Oliver knew often trespassed and stole items from people's properties—is also a contributing factor to the court's reasonable suspicion analysis. Because reasonable suspicion must be particularized to the suspect in question, Lewis's association with French would add little, if anything, to the reasonable suspicion calculus. *See United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011) ("Simply talking to someone else, without more, is innocent activity and does not indicate that a crime is happening or is about to take place."); *United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003) ("[T]he officers only could factor in [the defendant's] actions and the circumstances surrounding him alone in order to constitute reasonable suspicion."). However, we do not resolve this dispute between the parties. Even without considering Lewis's association with French, Oliver had sufficient information to establish reasonable suspicion.

C.

Finally, Lewis disputes whether Oliver had reasonable suspicion to search his person for weapons. When an officer makes a *Terry* stop, he may also perform a precautionary search—known as a frisk or pat down—whenever he has reasonable suspicion that the person searched may be armed and dangerous. *Knowles v. Iowa*, 525 U.S. 113, 118 (1998). Again, reasonable suspicion in this situation is "based on the totality of the circumstances." *Joshua v. DeWitt*, 341 F.3d 430, 443 (6th Cir. 2003). Ultimately, the test is whether "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." *United States v. Noble*, 762 F.3d 509, 521–22 (6th Cir. 2014) (alteration in original) (quoting *Terry*, 392 U.S. at 27). If the answer is yes, then the officer may conduct a brief pat-down search to determine whether the defendant is armed. *Pacheco*, 841 F.3d at 390.

Here, for the reasons detailed above, Oliver had reasonable suspicion that Lewis was carrying a firearm. Lewis patted his right hip when Oliver first approached, there was a bulge in his waistband at his right hip, and Lewis stood with his right hip angled away from Oliver. Based on his training and experience, Oliver recognized all three of these behaviors as indicators that Lewis was armed. *See also Mimms*, 434 U.S. at 111–12; *Stennis*, 457 F. App'x at 499–500; *Chandler*, 437 F. App'x at 424, 426. Thus, Oliver was entitled to conduct a brief pat-down search of Lewis to check for weapons.

IV.

The district court's denial of Lewis's motion to suppress is affirmed.

NALBANDIAN, Circuit Judge, concurring and concurring in the judgment. I agree that there is no Fourth Amendment violation here. But I write separately on the issue of when the officers seized Lewis. The majority holds that police seized Lewis when Officer Oliver told him he'd run a warrant check on his name. I believe the seizure came shortly after, when a second officer arrived and blocked Lewis's exit up the alley.

As the majority points out, whether a seizure has occurred depends on the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). The question is whether "a reasonable person would have believed that he was not free to leave." *Id.* And facts that might suggest a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* Others include the purpose of the questioning; whether the place was hostile or coercive; how long it went on; the suspect's freedom of movement; and other indicia of custody. *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003).

So let's look at the circumstances as they existed when Oliver ran the warrant check. On one hand, Oliver was alone and hadn't displayed his weapon. Those facts weigh against a seizure. On the other, Oliver stepped closer to Lewis and asked for his real name. But "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see also United States v. Foster*, 376 F.3d 577, 584 (6th Cir. 2004) ("When Higgins first addressed Foster, Higgins asked Foster his name, what he was doing there, and whether he had any identification on him. This is permitted under Fourth Amendment precedent."). In fact, law enforcement can approach a person in public and ask him questions without a reasonable suspicion of criminal activity. *United States v. Smith*, 594 F.3d

530, 538 (6th Cir. 2010). And police "can position themselves immediately beside and in front of a suspect and even reach across a suspect, provided they leave a way out." *Id.*; *see also United States v. Drayton*, 536 U.S. 194, 197–99 (2002).

True, Oliver had taken a few steps toward Lewis, but he hadn't touched him. And the purpose of Oliver's interaction with French and Lewis was for Oliver "to make contact with" and get to know people in his neighborhood. In fact, Oliver reiterated to French and Lewis that he wasn't interested in making warrant arrests that night. And right after telling Lewis he'd run the warrant check, Oliver told him at least he'd "have the peace of mind of knowing" whether he had any outstanding warrants for his arrest. This, together with telling Lewis and French that he wasn't "about warrants" that night, suggests that Oliver wasn't running the check to detain Lewis but to give him information. *Swanson*, 341 F.3d at 529 (noting that the purpose of the questioning is relevant); *United States v. Rose,* 889 F.2d 1490, 1493 (6th Cir.1989) ("The subjective intent of the officers is relevant to an assessment of the fourth amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted.").

This all points to a consensual encounter. Oliver was alone, hadn't drawn his weapon, hadn't touched Lewis, and maintained the same tone of voice as he had earlier in the encounter. *See Mendenhall*, 446 U.S. at 554. His stated purpose in asking Lewis for his name and running the check was informational, the interaction took place on a public street, and Lewis's path back up the alley was unimpeded. *See Swanson*, 341 F.3d at 529.

In other words, none of the traditional indicia points us to a seizure here. So it's hard to see how adding the warrant check—unaccompanied by any restraints on Lewis's freedom of movement or exchange of a physical ID—transforms this prototypical consensual encounter into a *Terry* stop. I've found no support for this. The warrant check is of course one factor among

others to consider. But I don't think a warrant check changes a consensual encounter into a seizure when no other circumstance supports such a metamorphosis. *See United States v. Weaver*, 282 F.3d 302, 310 (4th Cir. 2002) (refusing "to adopt a brightline rule that when an officer retains an individual's identification beyond its intended purpose, in this case checking for outstanding warrants, the individual whose identification is retained is effectively seized for purposes of the Fourth Amendment").

And cases holding that a seizure occurred during a warrant check generally involve two facts beyond what we have here: the officers explicitly told the defendants not to leave, and they retained a physical copy of the defendants' identification. *See, e.g.*, *United States v. Tyler*, 512 F.3d 405, 410–11 (7th Cir. 2008) (officers took defendant's identification and retained it while they ran a warrant check and told defendant he could not leave until the warrant check finished); *United States v. Lopez*, 443 F.3d 1280, 1282 (10th Cir. 2006) (warrant check was a seizure where officer held onto license and told defendant to wait).[1]

The majority cites *United States v. Campbell*, 486 F.3d 949 (6th Cir. 2007) to support its holding on the timing of the seizure. But I'm unconvinced. In *Campbell*, a police officer conditioned the defendant's ability to leave on the officer's checking the defendant's identification. *Id.* at 957 ("Only later in their exchange—after Campbell said that he had no ID—did Officer Salser 'seize' Campbell by creating the condition that 'he could be on his way just as soon as [I]

---

[1] It's also worth noting that state courts considering the question have held that a warrant check, by itself, isn't a seizure under the Fourth Amendment. *See State v. McInnis*, 169 N.H. 565, 568 (2017) (no seizure when single uniformed police officer approached defendant, explained he was investigating a crime, asked if defendant was involved, then ran a warrant check in his presence); *State v. Martin*, 79 So.3d 951, 959–60 (La. 2011); *Wilson v. State*, 199 P.3d 517, 520 (Wyo. 2009) ("Appellant was engaged in a consensual conversation with the officer when the warrant check was conducted."); *State v. Page*, 73 So.3d 351, 352 (Fla. Dist. Ct. App. 2011) (holding that "the mere act of running appellee's name for an active warrants check does not require reasonable suspicion"); *State v. Adams*, 158 P.3d 1134, 1137 (Utah Ct. App. 2007) (officer's act of taking defendant's identification for a minute to conduct a warrant check was consensual); *State v. Johnson*, 517 N.E.2d 262, 264 (Ohio Ct. App. 1986) (defendant wasn't seized when two uniformed officers approached him, asked his name, and ran a warrant check).

ID'd him.'"). Here, though, Oliver told Lewis he would "run that [warrant] check real quick" so that Lewis would have "peace of mind." Nothing in that conditions Lewis's ability to leave on the completion of the check.

The majority also cites *United States v. Smith*, 594 F.3d 530 (6th Cir. 2010). In *Smith* we held that police seized the defendant not when several officers surrounded him and began asking him questions in a closed space, but when an officer directed him to "stop" when he tried to leave. *Id.* at 539 ("Once Officer Putnick asked Smith to stop, a reasonable person would not have felt free to leave…."). That kind of explicit command is absent here. And police issued a similar command in *United States v. Richardson*, 385 F.3d 625 (6th Cir. 2004). That case, like *Smith*, involved police telling the defendant to stay put. *Id.* at 630 ("'Okay, just hang out right here for me, okay?'"). And the officer issued the command to the *driver* of a vehicle—but a *passenger* raised the Fourth Amendment claim. *Id.* at 627–28. Of course, "[w]hen the driver is not free to leave, neither are his passengers; indeed, the passengers are at the mercy of any police officer who is withholding the return of their driver." *Id.* at 630. Here, though, unlike that passenger, Lewis's freedom of movement didn't depend on anyone, let alone a person whom a police officer had just commanded to stay put.

In short, I don't believe Oliver seized Lewis when he said he'd run a warrant check. Instead, officers seized Lewis when a second officer arrived and blocked Lewis's main path away from the encounter. But because I agree that officers had a reasonable suspicion to seize Lewis when Oliver ran the warrant check and also when the second officer arrived, I agree with the majority's decision to affirm.

CLAY, Circuit Judge, dissenting. Under some circumstances, law enforcement officers are permitted to stop and interrogate persons who are acting suspiciously, even when there is no probable cause for an arrest, without violating the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 22 (1968). What law enforcement officers are not permitted to do is to stop and interrogate individuals where there is no probable cause, or even reasonable suspicion, to believe that criminal activity may be underway—in the hope or expectation that reasonable suspicion may arise or develop in the course of the encounter to justify seizure of those individuals pursuant to the Fourth Amendment. That appears to be what happened in the instant case. The police action, under the circumstances of this case, should be repudiated, and the motion to suppress should have been granted.

On the night in which Defendant Devin Lewis was seized, Officer Nick Oliver was patrolling a neighborhood at night and was not investigating any suspected criminal activity when he observed Lewis and his acquaintance, Amber French, walking down a public alley. While the alley had purportedly been commonly used by individuals to evade police detection or trespass into adjacent residential areas, no trespass had been reported that night, and the two individuals were neither committing nor suspected of committing any trespass or other criminal activity. At that point, Oliver decided to park his police cruiser close to French and Lewis with the headlights flashing in their faces. Officer Oliver got out of the car, shined a flashlight in their faces, and asked French and Lewis if he could speak to them, all while dressed in full uniform and carrying a weapon. While he initially engaged French in a conversation, a few seconds into the encounter, Officer Oliver requested that Lewis—who was standing close behind French—take his hand out

of his pocket (presumably to ensure he did not have a weapon), a request with which Lewis immediately complied.[1]

The Fourth Amendment's protection against unreasonable searches and seizures was meant to "prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976). By denying the motion to suppress in this case, the district court chipped away at this protection, allowing Officer Oliver to seize Lewis and engage in a *Terry* stop and frisk without any reasonable suspicion that Lewis was participating in any criminal activity. At the time Lewis was seized— when Oliver parked his police cruiser right in front of Lewis and French, began speaking to them, and specifically requested that Lewis take his hand out of his pocket—Oliver had no reason to be "suspicious" based on the fact that Lewis and French were walking together in a public alley at night, in what the officer described as a "high crime area." Because these circumstances were not sufficient to give rise to reasonable suspicion to justify a stop and frisk, the district court's denial of Lewis' motion to suppress should be reversed and the case remanded for further proceedings.

In *Terry*, the Supreme Court held that "the Fourth Amendment governs 'seizures' of the person which do not [result] in a trip to the station house and prosecution for crime—'arrests' in traditional terminology," and that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U.S. at 16; *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("[The Fourth Amendment's] protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."). A person is seized

---

[1] Officer Oliver did not see Lewis pat his waistband or discard something that appeared small and white from behind his left ear until after Officer Oliver told Lewis to remove his hand out of his pocket. Additionally, after this point in the interaction—while talking to French and offering to run a warrant check on her—is when he noted Lewis's "bladed" stance and his "abnormally large bulge" near his right hip, prompting him to call for backup when he radioed to run the warrant check on French. (R. 59, Hr'g on Mot. to Suppress at PageID # 255:20–24, 256:3–4.)

during a police interaction when "by means of physical force or a show of authority, his freedom of movement is restrained" such that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 553–54 (1980).

In considering when a person is "seized" by police for purposes of the Fourth Amendment, the Supreme Court has indicated that officers do not unreasonably seize individuals "by approaching [them] on the street or in other public places and putting questions to them if they are willing to listen," allowing officers to "pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 200–01 (2002). But in some circumstances "words alone may be enough to make a reasonable person feel that he would not be free to leave" regardless of whether the officer uses an "intimidating demeanor" or "coercive language." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (holding that passenger of a car was seized when the officer told the driver to "Okay, just hang out right here for me, okay?" and the passenger reasonably did not feel free to leave); *see also United States v. Beauchamp*, 659 F.3d 560, 568 (6th Cir. 2011) (holding that the officer seized the defendant by "driving up to him after he had already walked away from another officer and . . . specifically instruct[ing] him to stop and to change the direction in which he was going").

Based on the totality of the circumstances, Lewis was seized when Officer Oliver drove his police cruiser into the public alley, stopped Lewis and French as they were walking through this alley at night, and asked Lewis to take his hand out of his pocket to ensure that Lewis did not have a weapon. A reasonable person would not have felt free to leave the interaction with the officer who had parked his police vehicle with the headlights flashing right in front of Lewis and

French, shined a flashlight in their faces, and, immediately after asking if he could speak to them for a minute, requested that Lewis take his hand out of his pocket.

Even if the officer did not use a threatening tone, Oliver made a specific request of Lewis, with which a reasonable person would have felt compelled to comply. *See Richardson*, 385 F.3d at 630. This request, coupled with the police car being parked in front of Lewis and Officer Oliver being in full uniform and carrying a weapon, resulted in a situation in which a reasonable person would not have felt free to leave the interaction. *Cf. United States v. Preston*, 579 F. App'x 495, 499 (6th Cir. 2014) (holding that the defendant had not been seized when, "unprompted by the officers, Preston voluntarily walked toward the police car through the well-lit parking lot of the liquor store" and the officer "rolled down his window and asked in a conversational tone to see Preston's hands and whether he possessed a weapon"). Further, in taking his hands out of his pockets, Lewis submitted to the officer's show of authority. *See United States v. Johnson*, 620 F.3d 685, 691 (6th Cir. 2010). (finding that the defendant submitted to a show of authority when "he 'yield[ed]' to the officers' yelled commands to 'stop' and 'stay right there where he was'").

Additionally, Lewis' theoretical ability to walk away from the interaction with Officer Oliver was not determinative of whether a reasonable person would have felt free to leave. While the majority notes that Officer Oliver's police cruiser did not completely block Lewis' exit, a reasonable person would likely not have felt free to walk away from an armed officer and, in particular, one who had made specific requests and parked a police cruiser right in front of him. *See United States v. Smith*, 794 F.3d 681, 686 (7th Cir. 2015) ("Common sense dictates that no reasonable person in an alley would feel free to walk 'through' two armed officers on bicycles."). And, generally, the fact that Lewis "stopped walking to respond to [the officer's] inquiry [] does

not, by itself, transform this encounter into a seizure." *O'Malley v. City of Flint*, 652 F.3d 662, 669 (6th Cir. 2011). But, in the present case, Lewis did not simply stop to respond to the officer's question; rather, he stopped because he felt that he had to comply with the officer's requests to speak to him and to take his hand out of his pocket, as would any reasonable person. Ultimately, Lewis was seized when Officer Oliver parked the police car in front of Lewis and French, asked to speak to them, and asked Lewis to remove his hand from his pocket.

When Lewis was seized, Officer Oliver had no reasonable suspicion to justify stopping Lewis. Pursuant to *Terry*, officers can briefly stop individuals for whom they have reasonable suspicion that the person is participating in criminal activity based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21. In *United States v. Cortez*, the Supreme Court provided further guidance on the reasonable suspicion standard, noting that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." 449 U.S. 411, 417–18 (1981). Additionally, reasonable suspicion is determined "based on the totality of the circumstances in place at the time of seizure." *Johnson*, 620 F.3d at 692. While officers cannot rely on a mere hunch to justify a stop, they can "make inferences from the information available to them that 'might well elude an untrained person.'" *United States v. McCauley*, 548 F.3d 440, 444–45 (6th Cir. 2008) (quoting *Arvizu*, 534 U.S. at 273). And an officer may conduct a limited frisk of an individual properly stopped under *Terry* if the officer has reasonable suspicion that the individual is "armed and dangerous." 392 U.S. at 27.

In terms of what characteristics or behavior can provide an officer with reasonable suspicion to conduct a *Terry* stop, we have found that an anonymous tip can provide reasonable suspicion "when the police know the tipster to be reliable or when the tip contains independently

verifiable details showing knowledge." *Northrop v. Trippett*, 265 F.3d 372, 381 (6th Cir. 2001); *see also United States v. Patterson*, 340 F.3d 368, 371 (6th Cir. 2003) (finding that an anonymous tip that "merely described drug activity without any details as to the perpetrators" was not sufficiently reliable to create reasonable suspicion because it could not predict "future unlawful activities"). Additionally, although not sufficient on its own, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," and "[h]eadlong flight—wherever it occurs—is the consummate act of evasion." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). *But see Beauchamp*, 659 F.3d at 570 ("[W]alking away from an officer does not create such a reasonable suspicion. . . . In those cases in which we have found that walking away from police does contribute to reasonable suspicion, specific facts have shown that the defendant's behavior was otherwise suspicious."). Similarly, furtive conduct such as "[b]ending or leaning tends to be more suspicious when accompanied by some other indication of an attempt to conceal contraband or to reach for a weapon, such as arm movements or the sound of an item being moved." *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006), *abrogation on other grounds recognized by United States v. Betts*, 806 F. App'x 426 (6th Cir. 2020).

None of the aforementioned "suspicious" circumstances were present in the instant case, nor any other circumstances that would have provided Officer Oliver reasonable suspicion that Lewis was engaged in any criminal activity. At the time of the seizure, all Oliver knew was that there were two individuals walking down a public alley at night in what he described as a "high crime area." Although the public alley in which Lewis and French were walking had been used in the past to trespass on adjacent private property, no trespasses had been reported that night, and Officer Oliver had not seen Lewis commit a trespass. Additionally, the fact that Lewis was with French, with whom Oliver had interacted in the past based on her previous trespass and theft

offenses, does not factor into the *Terry* stop focused on Lewis inasmuch as reasonable suspicion must be particularized to the specific individual. *See Cortez*, 449 U.S. at 417–18. That French and Lewis were seen walking together "is not probative of criminal activity" as "[s]imply talking to someone else, without more, is innocent activity and does not indicate that a crime is happening or is about to take place." *Beauchamp*, 659 F.3d at 570. Further, the fact that an individual was in a high crime area late at night does not, "without more, give rise to a reasonable suspicion." *Caruthers*, 458 F.3d at 467. Otherwise, officers would be effectively allowed to stop anyone present in a purported high crime area at any time without a basis to suspect criminal activity; justifying a police stop, in part, by "labeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling." *Id.*

Ultimately, the officer had no reasonable suspicion based on specific and articulable facts to believe that Lewis was involved in criminal activity in order to justify a *Terry* stop. Because there was no reasonable suspicion for the stop itself, the officer had no basis to conduct a frisk. *See Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (noting that "[w]hen the stop is justified by suspicion (reasonably grounded, but short of probable cause) that criminal activity is afoot" and the officer has "reasonable suspicion that the persons temporarily detained are armed and dangerous," the officer can conduct "a limited search of outer clothing for weapons"). Accordingly, I would reverse the district court's denial of Lewis' motion to suppress evidence obtained during the *Terry* stop and remand the case for further proceedings.